**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ISABEL M. RODZIK,                ) | |
|                   ) | |
|       Plaintiff,        ) | |
|               ) | |
|    v.             ) | Civil Action No. 2:25-cv-00094 |
|               ) | |
| LIBERTY BAY RECOVERY CENTER, LLC,  ) | |
| GRANITE RECOVERY HOLDINGS, LLC, and  ) | |
| BAYMARK HEALTH SERVICES, INC.    ) | |
|              ) | |
|       Defendants. | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED**
**MEMORANDUM OF LAW**

Defendants Liberty Bay Recovery Center, LLC, Granite Recovery Holdings, LLC, and Baymark Health Services, Inc. (collectively "Defendants"), by and through undersigned counsel, respectfully move for summary judgment in their favor as to all claims set forth by Plaintiff Isabel Rodzik ("Plaintiff" or "Rodzik").

**INTRODUCTION**

Plaintiff Isabel M. Rodzik alleges she was terminated from her position as Executive Director of Liberty Bay Recovery Center ("Liberty Bay") because she suffers from postural orthostatic tachycardia syndrome ("POTS") and requested a reasonable accommodation related to the condition. The undisputed facts, however, demonstrate Plaintiff was unable to perform the essential functions of the job and her termination was a result of that failing—not her purported disability. Plaintiff was employed at Liberty Bay for fewer than 90 days—from January 3, 2023, through March 31, 2023—during which time she was absent, late, left early or was working remotely the majority of her scheduled workdays, resulting in documented performance deficiencies and operational failings. These deficiencies were communicated to Plaintiff, but no amendment in behavior occurred, ultimately resulting in her termination.

1

Plaintiff's Amended Complaint alleges six counts against the Defendants: Counts I and IV allege unlawful discrimination under the Americans with Disabilities Act ("ADA") and the Maine Human Rights Act ("MHRA"), respectively; Counts II and V allege failure to accommodate under the ADA and MHRA; and Counts III and VI allege retaliation and interference under both statutes. Defendants move for summary judgment on all counts for multiple, independent reasons.

First, the undisputed record—including the testimony of Plaintiff's expert and treating provider—establishes that Plaintiff was unable to perform the essential functions of her position with or without a reasonable accommodation.  Her provider testified Plaintiff's POTS flare-ups lasted one to two weeks, occurred regularly and unpredictably, and during episodes Plaintiff either could not or was severely limited in her ability to perform essential work-related duties.

Second, Plaintiff cannot establish that Defendant's legitimate non-discriminatory reason for her termination was pretextual, and is thus unable to show the causal connection required for her discrimination and retaliation claims.  The performance concerns that formed the basis for Plaintiff's termination were documented in writing, and communicated to Plaintiff before she submitted any formal accommodation request.  These documented concerns, which preceded or were contemporaneous with any protected activity, negate any inference of retaliatory or discriminatory motive and no evidence of pretext is evident in the record.

Third, Plaintiff cannot sustain her interference or failure-to-accommodate claims because no accommodation request was denied.  Every request Plaintiff made for time off or remote work was granted and upon receiving Plaintiff's medical documentation on March 17, 2023, the organization immediately initiated the interactive process, and the accommodation request remained pending when Plaintiff was terminated for performance reasons.

Fourth, Defendants Granite Recovery Holdings, LLC, and BayMark Health Services, Inc. are entitled to judgment as a matter of law because neither entity employed Plaintiff or any other person during the relevant time period. Both entities employed zero employees, exercised no control over Plaintiff's employment at Liberty Bay, and played no role in decisions regarding Plaintiff's employment or termination from employment.

Finally, Plaintiff's federal claims under the ADA (Counts I, II, and III) fail for the additional reason that Plaintiff did not satisfy the administrative prerequisites for suit. Plaintiff filed her original Complaint on March 18, 2025, before receiving a right-to-sue notice from the EEOC. Plaintiff's counsel did not contact the EEOC to request issuance of a right-to-sue letter until May 28, 2025—more than two months after filing suit—confirming that no such notice had been received at the time the action was commenced.

For all of these reasons, there is no genuine dispute of material fact, and Defendants are entitled to judgment as a matter of law on each of the six counts of the Amended Complaint.

### FACTUAL AND PROCEDURAL BACKGROUND

Liberty Bay is a residential treatment facility in Portland, Maine (SOMF ¶ 1), that provides medical, counseling, and other support services to individuals struggling with addiction. Defendant Granite Recovery Holdings, LLC, is a subsidiary of BayMark Residential Treatment Services, Inc., and a parent to Granite Recovery Center, LLC, which operates Liberty Bay Recovery Center, LLC. (Id. ¶ 2.) Granite Recovery Holdings, LLC, did not employ any employees at any time during the years of 2022, 2023, and 2024. (Id. ¶ 4.) Defendant BayMark Health Services, Inc., is the parent of BayMark Residential treatment Services, Inc., which in turn is the parent of Granite Recovery Holdings, LLC. (Id. ¶ 3.) BayMark Health Services, Inc., did not employ any employees at any time during the years of 2022, 2023, and 2024. (Id. ¶ 5.)

The Executive Director manages operations at the facility and has full oversight of the Liberty Bay facility. (Id. ¶ 11.) The Executive Director was responsible for overseeing treatment services at Liberty Bay, managing Liberty Bay's operations, providing guidance and resources to staff and patients of the facility, overseeing recruitment and staff training, interpreting profit and loss statements, ensuring client-oriented care delivery system, coordinating activities with Clinical, Nursing, and Operations departments, ensuring compliance with regulatory and legal compliance and internal policies and procedures, making decisions and finding alternative solutions for problems at the facility. (Id. ¶ 10.) The Liberty Bay director of operations, clinical director, nursing manager, and case management manager all reported directly to the Executive Director and worked onsite full-time at Liberty Bay. (Id. ¶ 12.) Due to the responsibilities of the Executive Director role, it was important that the Executive Director be present onsite at the facility full-time. (Id. ¶ 13.) The Executive Director needed to have on-the-ground understanding of what is occurring at the facility to ensure regulatory and insurance compliance, be in tune with client needs and progress, meet with clients who are struggling or have a grievance, and manage and assist staff with crises that arise. (Id. ¶ 14.) Most of the work of the Executive Director was done at the treatment center itself and the role could not be performed effectively remotely on a long-term basis, and treatment centers are a "very fluid" environment due to client needs and crises. (Id. ¶ 15.) There was little meaningful work that could be done remotely; Plaintiff could communicate and be available for staff and leadership while remote. (Id. ¶ 15, 41.)

Plaintiff began working as the Executive Director at Liberty Bay on January 3, 2023.[1] (Id. ¶ 9.) She reported directly to Eric Ekberg, the Chief Executive Officer of Granite Recovery Centers, LLC. (Id. ¶¶ 6, 7.) Ekberg worked primarily in New Hampshire and supervised several

---

[1] Plaintiff's paystubs identify her employer as "Liberty Bay Recovery Center, LLC." (SOMF ¶ 109.)

facilities, including Liberty Bay, and so he was not consistently onsite at Liberty Bay—leaving Plaintiff as the most senior position onsite to monitor operations. (Id. ¶¶ 6, 10, 12.)  The Executive Director was expected to be on-site a minimum of 40 hours per week, Monday through Friday, and working additional hours during weekends or evenings would not be unusual. (Id. ¶ 16.) On Plaintiff's first day of work, Ekberg discussed with Plaintiff the role, expectations, and goals of the Executive Director, and explained that it was critically important that the Executive Director be present and available to all staff and clients in the facility. (Id. ¶ 17.)

Although unknown to Liberty Bay when Plaintiff was hired, Plaintiff alleges she was diagnosed with postural orthostatic tachycardia syndrome ("POTS"). (Id. ¶ 18.)  During onboarding with Liberty Bay, Plaintiff was provided with a voluntary self-identification form to disclose a disability and request a reasonable accommodation but left the self-identification form blank because she felt she did not need any reasonable accommodation, despite having taken time off from prior employers for flare-ups of her POTS. (Id. ¶¶ 43, 44.)  When Plaintiff has POTS flare-up, she experiences symptoms including a heart rate of up to 160 beats per minute, headache, dizziness, blurred vision, chest pain, and shortness of breath as well as nausea, vomiting, the need to lay down and to receive fluid replacement at the hospital.   (Id. ¶¶ 24, 28.)  Plaintiff's symptom of rapid heart rate can occur daily. (Id. ¶ 19.)  Plaintiff experienced "flare-ups" of her condition and could require medical care approximately four times per month and sometimes more frequently, including during the time she worked at Liberty Bay. (Id. ¶ 20.) Plaintiff's flare-ups also cause her to experience difficulty using a screen or a computer, inability to effectively multitask, inability to effectively interpret and work on complex profit and loss statements, inability to oversee day-to-day operations of a residential drug rehabilitation center, inability to work in a fast-paced environment and/or to provide or ensure that a residential drug rehabilitation

5

center is providing client-centered care delivery.  (Id. ¶¶ 30, 31, 32, 33, 34, 37.)  In the midst of a POTS flare, Plaintiff's ability to make decisions and find alternative solutions to problems would be adversely affected. (Id. ¶¶ 35, 36.) Plaintiff's flare-ups last one to two weeks with ongoing ramifications during that timeframe.  (Id. ¶¶ 20, 29.)  Recovery from flare-ups also cause Plaintiff to experience extreme fatigue and, during a flare, her ability to brush her teeth, go to the bathroom and feed herself were impacted.  (Id. ¶¶ 25, 38.)

Between January and March 2023, Plaintiff had more flare-ups than usual because she had COVID in January and COVID exacerbates Plaintiff's POTS symptoms. (Id. ¶ 21.)  Plaintiff estimates she had five flare-ups of her POTS in January 2023. (Id. ¶ 22.)  In February 2023, Plaintiff's POTS symptoms were "really bad." (Id. ¶ 23.) Meneah Haworth, FNP-C ("Haworth"), Plaintiff's treating provider beginning in January 2023, was designated by Plaintiff as her expert witness to opine on topics including the nature and severity of symptoms associated with Plaintiff's POTS. (Id. ¶¶ 26, 27.)  Haworth testified that if a patient is in a POTS flare, they would "need time to recover.  So rest away from the stress stimulus, work, and then they could potentially return" once "they were no longer having symptoms." (SOMF ¶ 39.)  Plaintiff defers to her provider to determine what she could and could not do at work while recovering from a flare, though she felt that working remotely would help due to the fatigue associated with recovery. (Id. ¶ 40.)

Beginning on Plaintiff's second day of work, she was regularly absent from work or unexpectedly remote for full and partial days.  Between January 4, and January 13, 2023, Plaintiff did not work onsite because she had COVID; during that time she was attending zoom meetings remotely but she does not remember performing other work. (Id. ¶¶ 45, 46.)

On January 16, 2023, Plaintiff's first Monday back after her COVID absence (and second day of work on-site), Ekberg told Plaintiff he understood she had been sick but it was imperative

6

she show all staff she was committed to the facility by being present and visible. (Id. ¶ 47.)  On Friday, January 27, 2023, Rodzik worked remotely due to a flat tire. (Id. ¶ 48.)  The week of January 20, Plaintiff left work at 3:15 p.m. each day.  (Id. ¶ 49.) On January 31, 2023, Plaintiff worked remotely due to her daughter's school closure and was unavailable to meet with the Medical Director about employee concerns.  (Id. ¶ 50.)  Rodzik did not email Ekberg until 1:17 p.m. to inform him that she would be remote that day (January 31) due to her daughter's school closure. (Id. ¶ 51.) Plaintiff's excuses for not being at work in January included sickness, a flat tire, lack of child care, school closure, and other reasons that were never explained.  (Id. ¶¶ 45, 48, 49, 50, 51.)   In January, Complainant was absent, worked a partial day, or was remote for at least 10 out of 21 working days.  (Id. ¶¶ 45, 48, 49, 50, 51.)

Plaintiff left work at 10:00 a.m. on February 1, 2023, for her daughter's dentist appointment, returned to the office and left again at 3:15 p.m. (SOMF ¶ 52.) On February 10, Plaintiff was late to work and attended the morning meeting—which she was supposed to lead— remotely.  (SOMF ¶ 53.) On February 13, 2023, Plaintiff worked remotely due to lack of childcare and at 2:32 p.m. notified Liberty Bay that she was at urgent care with her daughter and needed a co-worker to approve timecards on her behalf or staff would not have been paid.  (SOMF ¶¶ 54, 55.) On February 16, 2023, Plaintiff was unable to work because she went to the hospital because of an elevated heart rate. (SOMF ¶ 56.)  That day she texted Ekberg, "I am at the hospital.  I have a syndrome called POTS it requires me to get fluids.  I will be here until my heart rate goes down. I apologize for the inconvenience.  I will zoom into meetings today but will be unable to present my MOR." (Id. ¶ 57.)  Ekberg asked Plaintiff to let her team know and Plaintiff texted Gabrielle Roberts ("Roberts") that she was at the hospital and would be "remoting in" for morning meeting and asked Roberts to inform the team of her status. (Id. ¶ 58.) Plaintiff followed up in an email to

7

Ekberg that she was working from the hospital and was planning to do a presentation to leadership while being treated at the hospital despite having a very fast heart rate and not feeling well.  (Id. ¶ 59.)  The week of February 20, 2023, Plaintiff left work at 3:30 p.m. on Monday and Friday that week for infusions and at 4:30 p.m. on the other days that week. (Id. ¶ 63.)  On February 23, 2023, Plaintiff was late to work and worked remotely due to her daughter not being in school that week. (SOMF ¶ 64.)  On February 27, 2023, Plaintiff was not at work due to a reaction to medication, which she did not notify Robers of until 1:46 p.m. that day. (Id. ¶ 65.)  In February, Plaintiff was absent, worked a partial day, or was remote on at least 10 out of 20 working days due to childcare issues, her child's medical appointments, and medical issues.  (Id. ¶¶ 52-59, 63-65.)

Ekberg received concerns from Liberty Bay employees, including Directors, that they "didn't know where" Plaintiff was and that she was not in the office. (Id. ¶ 60.)  As a result, Ekberg had a conversation with Plaintiff to make sure she was communicating with her staff about her location. (Id. ¶ 60.)   Liberty Bay's Unplanned Absence Policy provides that employees must contact their supervisor before their workday begins if they will be absent and must provide at least two hours advance notice if they are going to be absent for the day or at least 30 minutes if an employee is going to be late. (Id. ¶ 61.)  The Unplanned Absence Policy further provides that "Employees with excessive absenteeism or failing to follow the proper notification of absenteeism process . . . may be subject to disciplinary action, up to and including termination." (Id. ¶ 62.)

In March, the pattern of absences continued.  Between March 1 and March 31, Plaintiff was absent, worked a partial day, or was remote for at least 18 out of 23 workdays.  (Id. ¶¶ 66, 72-75, 77, 78, 79, 80, 87, 88, 93.)  On March 3, 2023, Plaintiff was offsite midday for a medical appointment. (Id. ¶ 66.) On March 6, 2023, Ekberg sent an email to Shawn Gilpatrick[2] requesting

---

[2] Shawn Gilpatrick was a Director of Human Resources employed by Granite Recovery Centers, LLC, which provided operational support to Liberty Bay Recovery Center. (SOMF ¶ 90.)

that several performance and communication concerns be placed in Plaintiff's file, including: (a) on February 28, after prior mistakes with offer letters, Ekberg specifically asked Plaintiff to work with HR to generate an offer to a potential new APRN, but Plaintiff decided to try it herself and the offer was rejected;[3] (b) between March 3-6, Ekberg sent emails seeking clarity on census and discharges, and Plaintiff either did not respond or did not answer the questions asked;[4] and (c) on March 6, during a discussion about a problem client over the weekend, Plaintiff could not provide basic information such as why the client was medically discharged, who was paying for the client's stay, or whether the client's family had been called, despite claiming she had been working on the issue all weekend.[5] (Id. ¶ 67.)  That same date, March 6, 2023, Plaintiff was offsite mid-day for an infusion, which she did not notify her team about until after she returned. (Id. ¶ 72.) On March 7, Plaintiff left work at 4:00 p.m. (Id. ¶ 73.) On March 8, Plaintiff left work around 11:30 a.m. for an appointment and worked remotely the rest of the day. (Id.¶ 74.) On March 9 and 10, Plaintiff left work at 4:00 p.m. (Id. ¶ 75.) On March 13, Plaintiff was not at work because she was going to the hospital and did not notify Ekberg until 10:18 a.m. (Id. ¶ 77-78.) The week of March 13, Plaintiff planned to be on PTO or work remotely on Tuesday and on PTO on Thursday March 16 after 12:30 p.m. (Id. ¶ 79.)  Ultimately on March 16, plaintiff communicated at 7:58 a.m. that she was going to work remotely because she was feeling "under the weather" and took the afternoon off for a medical appointment. (Id. ¶ 80.)  In response to Plaintiff's 7:58 a.m. email, at 9:20 a.m., Ekberg responded to Plaintiff noting that she had been out most of the day Monday and all of the

---

[3] Plaintiff attempted to handle the hiring matter herself, rather than through Jobvite, resulting in her requests getting bounced back, causing frustration to her manager. (SOMF ¶ 71.)

[4] Plaintiff was unresponsive to Ekberg's request for updates and information as to why daily census were off and failed to acknowledge whether she was in receipt of his requests. (SOMF ¶ 69.)  After two months in the role, Rodzik's reporting of headcount remained inaccurate and she was unable to explain why the census data she was reporting on was incorrect. (SOMF ¶ 70.)

[5] Ekberg stated in his March 6, 2023, email that "with a census of 15 the ED needs to be on top of the comings and goings of all clients and would need to know this basic information especially if as she stated she was working on call this weekend." (SOMF ¶ 68.)

day Tuesday that week, that there were many issues going on at the facility that he believed stemmed from a lack of leadership, and he stated, "as I have stated before the role of ED at Liberty Bay is not a remote position" and he needed the Executive Director "to be on-site and present in a full-time capacity." (Id. ¶ 81.) Plaintiff responded that she completely agreed and understood that the role needed to be on-site and present full-time. (Id. ¶ 82.) At 9:39 a.m., Plaintiff asked Haworth for a detailed note about her health and why she needed to work remotely, and noted that her job was "on the line" and was "an in-person job and they are very strict about [her] being there." (Id. ¶ 83.)

Plaintiff's absences were concerning. Ekberg never told Plaintiff she could not leave work for her medical appointments, (id. ¶ 76), however, as a leader of Liberty Bay, it was critical that Plaintiff be present to oversee the facility and its operations. In addition to attendance, Plaintiff's performance issues had become concerning, as well. Plaintiff had made mistakes in preparing offer letters, failed to follow instructions to work with HR, failed to timely respond to work-related inquiries from her supervisor and others in the organization, and was unable to provide key information about Liberty Bay's operations to her supervisor. (Id. ¶¶ 68-71.)

On March 17, 2023, Plaintiff had an in-person discussion with Ekberg in which they discussed her absences and the impact they had on staff morale, and her poor standing with staff; Ekberg told Plaintiff she had a lot of work to do to get the staff's trust back. (Id. ¶ 84.) In this meeting, Complainant brought up her health flare-ups. (Id. ¶ 85.) Ekberg emphasized that her health should be her priority and she should take care of herself; however, he reiterated that the Executive Director job could not be successfully done remotely. (Id. ¶ 86.)

At 12:50 p.m. on March 17, Plaintiff sent Gilpatrick a letter from her physician dated March 16, 2023, that stated Plaintiff is "managing debilitating flare ups that result in her need to take time

10

away from work to recover.  It is medically necessary for Isabel to work remotely when she is in a flare to allow time to recover" ("March 17 Med Note").  (Id. ¶ 88.)    The note did not indicate how the flare ups affected her ability to work in person, but did not adversely affect her ability to work from home.  (Id. ¶ 88.)  Plaintiff noted in her email to Gilpatrick that during her interview she was told that she did "need to be in the building but [she] could flex [her] time, leave early and/or be able to leave for doctors' appointments." (Id. ¶ 89.)  March 17, 2023, was Plaintiff's last active day at work; Plaintiff was out of the office following a car accident on March 20, 2023. (Id. ¶¶ 87, 93, 99.)

The following business day, Monday, March 20, Gilpatrick forwarded the email to Kristi Richardson, a Senior Human Resources Manager at a BayMark affiliate[6], to follow up on Plaintiff's options in relation to the March 17 Med Note.  (Id. ¶ 92.)  Plaintiff and Richardson spoke by phone to discuss Plaintiff's accommodation request.  (Id. ¶ 94.)    Following the call, Richardson emailed Plaintiff relevant information and forms to engage in the interactive process and consider Plaintiff's reasonable accommodation request related to her flare-ups; Richardson indicated the forms needed to be completed by April 2, 2023.  (Id. ¶ 95.)  On March 20, 2023, Plaintiff communicated to Haworth that HR had sent her ADA paperwork to complete and she would let Haworth know if she needed assistance completing the forms. (Id. ¶ 96.)

During Rodzik's leave from work as a result of her car accident, she failed to communicate her absences with her supervisor or discuss coverage during her absence. (Id. ¶ 97.) Plaintiff had not requested a reasonable accommodation for a disability before March 17, 2023. (Id. ¶ 98.) Plaintiff remained out of work as of Wednesday, March 22, but emailed Gilpatrick with a doctor's note from her primary care provider, which provided that her motor vehicle accident concussion

---

[6] Kristi Richardson was a Senior HR Manager employed by MedMark Services, Inc. (SOMF ¶ 91.)

11

resulted in the need for Plaintiff "to abstain from using screens, driving and work for at least the next 7 days." (Id. ¶ 99.)  That same day, Gilpatrick emailed Complainant asking if she had an anticipated return-to-work date.  Plaintiff did not respond.

On March 24, 2023, Ekberg emailed Gilpatrick a summary of concerns regarding Plaintiff's absences from January 2023 and noting "[o]n a regular basis since her arrival, I spoke with Isabel about the importance of being present and that this was not a remote job." (Id. ¶ 100.) On March 29, 2023, Tim Palus, Ekberg's supervisor noted Plaintiff had failed to perform follow-through on key initiatives, most notably the implementation of the RTC group-wide Patient Engagement calendars, a strategy that was "crucial for keeping . . . patients active in treatment," and which Palus tied to Liberty Bay's AMA rate of 24% being the "highest it's been in nearly a year" (Id. ¶ 101.) In layman's term, Palus was concerned that Liberty Bay was experiencing significantly higher than normal rates of clients leaving the facility against medical advice.  Liberty Bay had been underperforming and had issues at the leadership level and with morale during Plaintiff's employment. (Id. ¶ 102.)

Gilpatrick and HR Generalist Stacey Lane, called Plaintiff on Friday, March 31, 2023, to relay to her that her employment was terminated as of March 31, 2023, for failure to meet performance expectations and absenteeism.[7]  (Id. ¶¶ 103, 104.)  Plaintiff did not return the ADA Accommodation Forms prior to her termination. (Id. ¶ 105.) Plaintiff acknowledges that it is hard to establish oneself as a leader and learn and grow in a role when you are not present on-site full time; while Plaintiff felt she did the "best she could," she acknowledged the importance of on-site presence for her position. (Id. ¶ 106.)  As of March 31, 2023, Plaintiff's primary care provider, Haworth, had not diagnosed Plaintiff with POTS. (Id. ¶ 42.)

---

[7] Neither Granite Recovery Holdings, LLC, nor BayMark Health Services, Inc. had any employees who were involved int eh decision-making process related to Plaintiff's termination. (SOMF ¶¶ 107, 108.)

Plaintiff filed her Complaint on March 18, 2025. (SOMF ¶ 110; Complaint, ECF No. 1.) On May 28, 2025, Defendants filed a Motion to Dismiss because Plaintiff had failed to receive or plead receipt of an EEOC right to sue letter prior to filing her claim. (Def.'s Mot. To Dismiss, ECF No. 7.) Plaintiff's counsel contacted the EEOC on Wednesday, May 28, 2025, seeking dismissal of Plaintiff's claims against Defendants and issuance of right-to-sue letters against BayMark Health Services, Inc., Liberty Bay Recovery Center, LLC and Granite Recovery Holdings, LLC. (SOMF ¶ 111).  Plaintiff's counsel received the Notice of Rights for EEOC Charge No. 16B-2024-00124, No. 16B-2021-00338, and 16B-2024-00125 on May 29, 2025. (Id. ¶ 112). Plaintiff filed a first Amended Complaint on May 30, 2025, in response to the Motion to Dismiss (Am. Compl., ECF No. 9), specifically alleging issuance of a right to sue letter from the EEOC. (Id. at ¶ 20.)

## STANDARD OF REVIEW

"Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact . . . ." Verrier v. BlueTriton Brands, Inc., No. 2:20-cv-00443-JAW, 2022 WL 3347890, at *40 (D. Me. Aug. 12, 2022) (quotation marks omitted). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Id. (quoting Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014)).  A dispute of fact "is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77 (1st Cir. 2018) (quotation marks omitted).  "[A] material fact is one that has the potential of affecting the outcome of the case." Sensing v. Outback Steakhouse of Fl. LLC, 575 F.3d 145, 152 (1st Cir. 2009) (quotation marks omitted).  Courts view the evidence in a light most favorable to the nonmoving party.  Ayotte v. Barnhart, 973 F. Supp. 2d 70, 78 (D. Me. 2013).  However,

13

"[s]ummary judgment motions are decided on the record as it stands, not on the pleadings or on the nonmovant's vision of what facts might some day be unearthed by the litigation equivalent of an archeological dig." Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001). A plaintiff cannot defeat summary judgment based on "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." Id.

## ARGUMENT

### I.    Plaintiff is unable to establish the prima facie elements of disability discrimination under the ADA or MHRA. (Counts I, IV)

Plaintiff alleges that her termination was discriminatory under the ADA and MHRA. (Am. Compl. ¶¶ 67-69, 94-96.) Because, however, the undisputed facts establish Plaintiff cannot meet the prima facie standard (as she was not a qualified individual and cannot evidence her termination was related to her disability), summary judgment is required as to Counts I and IV.

To establish a prima facie case of disability discrimination under the ADA and MHRA, Plaintiff must establish: "(1) she has a disability; (2) she is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of her job; and (3) her employer adversely treated her based in whole or in part on her disability." Benson v. Wal-Mart Stores East, L.P., 14 F.4th 13, 26 (1st Cir. 2023) (citation modified) (noting prima facie case under MHRA "[m]irror[s]" the ADA); see also Tucker v. Town of Scarborough, No. 2:19-cv-00213, 2020 WL 3271936, at *7 (D. Me. June 17, 2020) ("[T]he Court analyzes the federal and state claims simultaneously under the analytical framework for interpreting the ADA."). Here, Plaintiff cannot establish the second or third elements of the prima facie standard.[8]

> **a.    Plaintiff could not perform her job's essential functions, which included being present onsite and managing operations consistently, with or without reasonable accommodation.**

---

[8] For purposes of summary judgment only, Defendants do not dispute that Plaintiff can establish the first element.

14

Plaintiff cannot establish the second element of her prima facie case because she could not perform the essential functions of her position, including being present onsite at the Liberty Bay facility and performing her managerial functions, on a consistent basis.  "An essential function is 'fundamental' to the position in question."  Benson, 14 F.4th at 26 (quote omitted).  To determine if a particular function is essential, the court looks to factors including written requirements, job descriptions, and the "consequences of not requiring the function."  Id.; see also 29 C.F.R. § 1630.2(n)(3)).  The employer's determination of which functions are essential is also evidence that a particular function is essential.  See 29 C.F.R. § 1630.2(n)(3).  The court's role is not to second guess the "employer's legitimate business judgment about what is required of its employees."  Benson, 14 F.4th at 27 (citing Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012) for the proposition that courts give a "significant degree of deference to an employer's own business judgment" about the necessities of a given job). "A plaintiff must plead and prove that she held . . . a job, and could perform its essential functions with or without reasonable accommodation, at the time of an employer's alleged act of disability-based discrimination." Stanley v. City of Sanford, Florida, 606 U.S. 46, 65 (2025); see Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003) (Plaintiff bears the burden of showing she is a qualified individual).

It is well-established that regular attendance is an essential function of a position.  See, e.g., Benson, 14 F.4th at 27 ("Regular attendance is an essential function of any job.").  It is also well-established that in-person physical presence at a job may also be an essential function of a role. See Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 34 (1st Cir. 2011) (concluding that employee's job description, municipal regulations, and supervisors' testimony, evidenced physical presence at the employee's job "was an understood expectation and requirement" and an essential function of the job).  For example, in Kvorjak v. Maine, 259 F.3d 48 (1st Cir. 2001), the First

15

Circuit analyzed whether a claims adjudicator's essential functions could be performed remotely in a case involving an employee's assertion that his employer failed to accommodate his disability. Id. at 56-57. The Court acknowledged that some functions of the role could be performed remotely, but also noted the role also was "the most senior, non-supervisory technical resource" for the employer, including being the primary person responsible for "trouble-shooting and problem resolution," about once a week. Id. at 56. In that capacity, the plaintiff was to be accessible to other employees for questions and problems, help at others' workstations and with equipment, and assist with other employees' calls. Id. Although some work could be performed by phone, the role involved training others, was part of a team where "on-the-spot collaborative efforts among . . . employees" was required, and was a "particularly vital participant[] because of their high level of technical skill." Id. at 56-67. Based on this evidence, the court concluded working in person was an essential function of the role and granted summary judgment to defendants. Id. at 58.

Undisputed evidence establishes that here, as in Kvorjak, regular, onsite presence was an essential component of the Executive Director position at Liberty Bay. (SOMF ¶¶ 10-17, 83, 84) The Executive Director manages operations at the facility and has full oversight of the Liberty Bay facility. (Id. ¶ 11.) The Executive Director is responsible for overseeing treatment services at Liberty Bay, managing Liberty Bay's operations, providing guidance and resources to staff and patients of the facility, overseeing recruitment and staff training ensuring client-oriented care delivery system, coordinating activities with Clinical, Nursing, and Operations departments, ensuring compliance with regulatory and legal compliance and internal policies and procedures, making decisions and finding alternative solutions for problems at the facility. (Id. ¶ 10.) Critically, the expectation and judgment of Plaintiff's supervisor was that the Executive Director position required full-time onsite presence. (Id. ¶¶ 14-17.) Most of the work of the Executive

16

Director was done at the treatment center itself and the role could not be performed effectively remotely on a long-term basis, and treatment centers are a "very fluid" environment due to client needs and crises. (Id. ¶ 15.)

Further, the Executive Director is a supervisor and leader at the facility.  (Id. ¶¶ 11-12.) The Executive Director's direct reports, including the director of operations, clinical director, nursing manager, and case management manager, all work full-time onsite.  (Id. ¶¶ 12.) Leadership was a key quality and job function for the ED, and Plaintiff herself agreed it is hard to establish yourself as a leader and learn and grow in a role when you are not present on-site full-time.  (Id. ¶¶ 106.)

Plaintiff's inability to work in-person consistently or predictably onsite was a proven reality.  During her three months of employment, Plaintiff worked a full-day onsite fewer than half the days she was employed.  (Id. ¶¶ 45, 48-50, 52-54, 56, 63-66, 72-75, 77-80, 87, 93, 99, 103.) Staff members and various directors at Liberty Bay would report that they did not know where Plaintiff was during the day.  (Id. ¶ 60.)  Further, Plaintiff's failure to be onsite was causing issues with her own performance and the performance of the facility more generally.  (Id. ¶¶ 67, 101, 102.)  Plaintiff's reason for being off-site, however, were often unrelated to her disability and instead the result of caretaking obligations, car issues, or other health issues (COVID, concussion). (Id. ¶¶ 45, 48, 49, 50-55, 64, 87, 93.)

Plaintiff's inability to perform the essential functions of a role resulted in Plaintiff's termination.  See Kvorjak, 259 F.3d at 56-57.  Accordingly, while Plaintiff's proposed accommodation of working remotely during a flare-up—which occurred approximately weekly and lasted for days or weeks at a time (SOMF ¶¶ 20, 29)—was unreasonable because it did not and would not have allowed Plaintiff to perform the essential functions of her job.  Plaintiff cannot

17

now use her disability as a license for failure to meet the expectations of the role. See Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001).

Further, Plaintiff's was unable to perform the essential functions of her role with or without the availability of remote work during a flare-up, because Plaintiff's disability symptoms rendered her unable to perform the essential functions of her role in any capacity for significant periods of time. (SOMF ¶¶ 29-40.)    During flare-ups of her condition, Plaintiff, experienced rapid heart rate, light-headedness, dizziness, nausea, and vomiting. (Id. ¶ 28.) To remediate her symptoms, Plaintiff needed to lay down and receive fluid replacement at the hospital. (Id. ¶¶ 28.)    During a flare-up, it was difficult for Plaintiff to use a screen or computer or perform even basic activities of daily living. (Id. ¶¶ 30-38.)    Plaintiff's ability to make decisions, problem-solve, work in a fast-paced environment, and manage a treatment facility were significantly impacted during a flare-up. (Id. ¶¶ 33-37.)  Accordingly, even if she were permitted to work remotely, she was unable to perform the essential duties of Executive Director on any regular or predictable basis. See Benson, 14 F.4th at 27. Accordingly, all of Plaintiff's claims alleging disability discrimination (under the ADA and MHRC) fail, as she was not a qualified individual under the statutes.

### b. There is no causal connection between Plaintiff's termination and her disability or request for reasonable accommodation.

Plaintiff also cannot establish her prima facie case of disability discrimination because she cannot establish there was a causal connection between her termination and disability or request for reasonable accommodation.  The undisputed records shows that Ekberg (and Liberty Bay) learned of Plaintiff's disability as early as February 16, 2023—months before Plaintiff was terminated. (SOMF ¶¶ 57, 103.)  The undisputed record also shows that Ekberg responded to Plaintiff's need for leave and notice of medical issues with compassion and understanding. (Id. ¶¶ 58, 59, 85.)  A month and a half later, when it was clear that Plaintiff lacked the skillset necessary

18

to lead the organization, Plaintiff was terminated for performance and attendance issues unrelated to her request for reasonable accommodation. (Id. ¶ 104.) On March 6, 2023, prior to Plaintiff's request for accommodation, Ekberg emailed Gilpatrick concerns as to Plaintiff's attendance and performance. (Id. ¶ 67.) On March 17, 2023, Ekberg sat down with Plaintiff to explain his concerns as to Plaintiff's performance. (Id. ¶¶ 84-85.) While Plaintiff reported she worked hard remotely and thought her job was flexible, it is the Company and not the employee's standard that dictates job duties and responsibilities. See Benson, 14 F.4th at 26. Moreover, communications regarding the basis for Plaintiff's termination establish that the reasons for termination included ongoing performance issues such as Plaintiff's inability to complete administrative job duties, failure to follow directions from leadership, and inability to build relationships with her team. (SOMF ¶ 67-68, 84-85, 104.)

In sum, Plaintiff's poor performance prior to March 17 and inconsistent presence were the catalyst for the termination decision—not Plaintiff's request for accommodation, which was made only after she had been verbally coached on her performance failings. (See Id. ¶ 83.)

      **II.**    **Even if Plaintiff can establish her prima facie case, Defendants have provided undisputed evidence of a legitimate, non-discriminatory reason for the termination which Plaintiff has failed to establish is pretext for disability discrimination.**

Under the McDonnell-Douglas burden shifting framework, even if Plaintiff has established a prima facie case of discrimination, she is unable to show discrimination because Liberty Bay had articulated a "legitimate reason for the termination." Johnson v. Whole Foods Market Grp., Inc., 657 F.Supp.3d 158, 174-75 (D. Me. 2023). If the employer is able to identify a legitimate non-discriminatory reason for termination, "the burden shifts back to the employee to show by a

preponderance of the evidence that the employer's non-discriminatory reason is pretextual and the actual reason for the termination is discriminatory." Id. at 175.

As set forth above, the decision to terminate Plaintiff's employment was based on performance considerations, including her frequent, unexpected absences from work. Plaintiff was terminated for failure to meet performance expectations and absenteeism. (SOMF ¶ 104.)   As to failure to meet performance expectations, Tim Palus, Erik Ekberg's supervisor, noted Rodzik had failed to perform follow-through on key initiatives, most notably the implementation of [the] RTC group-wide Patient Engagement calendars", a strategy that was "crucial for keeping . . . patients active in treatment," and which Palus tied to Liberty Bay's AMA rate of 24% being the "highest it's been in nearly a year." (Id. ¶ 101.)  Plaintiff had made mistakes in preparing offer letters, failed to follow instructions to work with HR, failed to timely respond to work-related inquiries from her supervisor and others in the organization, and was unable to provide key information about Liberty Bay's operations to her supervisor. (Id. ¶ 67.)  On at least one weekend, Rodzik was unresponsive to Ekberg's request for updates and information as to why daily census were off and failed to acknowledge whether she was in receipt of his requests. (Id. ¶ 69.)  After two months in the role, Rodzik's reporting of headcount remained inaccurate and she was unable to explain why the census data she was reporting on was incorrect. (Id. ¶ 70.)  Additionally, despite being directed to having HR handle hiring matters through Jobvite, Plaintiff attempted to handle them herself, resulting in her requests getting bounced back, causing frustration to her manager. (Id. ¶ 71.)

Additionally, March 17, 2023, Ekberg and Rodzik had a "lengthy one on one on-site discussing her absences and the impact it had on morale and her overall poor standing with staff;" during this meeting, Ekberg further shared that Rodzik "had a lot of work to do to get the staff's

trust back." (Id. ¶ 84.)  While Rodzik does not remember the conversation (Id. ¶ 86), that is not evidence that it did not occur.

As it relates to absenteeism, Rodzik was absent from work March 20, 2023, until the date of her termination, March 31, 2023, as a result of a car accident, unrelated to her disability. (Id. ¶¶ 87, 93, 99.)  During Rodzik's leave from work as a result of her car accident, she failed to communicate her absences with her supervisor or discuss coverage during her absence. (Id. ¶ 97.) Rodzik was out of work for almost two weeks in January because of COVID. (Id. ¶ 45.)  While out those first two weeks, she was attending Zoom meetings remotely but does not remember performing other work. (Id. ¶ 46.)  Friday, January 27, 2023, Rodzik did not come in to work, and worked remotely due to a flat tire. (Id. ¶ 48.)  Rodzik left work at 3:15 p.m. each day during the week of January 30. (Id. ¶ 49.)  Rodzik left work at 10:00 a.m. of February 1, 2023, for her daughter's dentist appointment, returned to the office and left again at 3:15 p.m. (Id. ¶ 52.)  In February, Plaintiff was again absent, remote, or not working a full day on numerous occasions due to childcare issues, medical appointments, and medical issues.  (Id. ¶¶ 52-54, 56, 63-65.)   That month, Plaintiff was absent, worked a partial day, or was remote on at least 12 out of 20 working days.  (Id. ¶¶ 52-54, 56, 63-65.)

Plaintiff was the most senior individual who was supposed to be on-site at Liberty Bay. Her presence and ability to accurately convey information and lead the organization were essential functions of the job, (See Id. ¶ 10) and she agreed that in order to establish herself as a leader, being present on-site full time was imperative. (Id. ¶ 106.) Plaintiff, however, was unable to perform these essential functions, resulting in Liberty Bay's decision to terminate her employment. While Plaintiff may believe she did the "best she could" as the Executive Director, (Id. ¶ 106), such is not the standard and it is not the court's job to "sit as 'super personnel departments,

assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.'" Johnson v. Whole Foods Market Group, Inc., 657 F. Supp. 3d 158, 176 (D. Me. 2023). In sum, Defendants have presented a legitimate non-discriminatory reason for the termination and the burden shifts back to Plaintiff to establish that the reason for termination is pretextual.

Plaintiff also cannot establish that this reason for termination was pretextual. Pretext can be established by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that would allow a reasonable factfinder to infer that the employer did not act for the asserted non-discriminatory reasons." Johnson, 657 F. Supp. 3d at 177 (citation modified). However, "[i]t is insufficient that the plaintiff impugn the veracity of the employer's proffered reasons; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a sham intended to cover up the employer's true motive." Id. The key inquiry is whether the employer believed its stated reason to be credible." Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009). Courts have recognized that "there is no mechanical formula for establishing pretext. One size does not fit all and the inquiry into pretext is the kind of inquiry in which 'everything depends on the individual facts." Ripoli v. Dep't of Human Srvs. Office of Veterans Servs., 123 F.4th 565, 575 (1st Cir. 2024) (quotes and citations omitted).

Here, Plaintiff cannot identify contradictions in the termination reason to establish pretext. See Johnson, 657 F. Supp. 3d at 177. The stated reason for Plaintiff's termination, failure to meet performance expectations and absenteeism (SOMF ¶ 104), has remained consistent since her termination. Plaintiff also is unable to show weaknesses in the stated reason for her termination. See Johnson, 657 F. Supp. 3d at 177. Specifically, Plaintiff has not identified a similarly situated employee who was not disabled, who missed the quantity of work that she did for reasons unrelated

22

to her disability, and who had the performance issues that she did, who remained employed. Similarly, Plaintiff cannot show that the job duties and responsibilities that she was responsible for were being met.  Despite Plaintiff's perceptions about her performance, she was not meeting her supervisor's expectations, and such standard, so long as it is non-discriminatory, it is not within Plaintiff or the Court's purview to assess. See Johnson, 657 F. Supp. 3d at 176.

Finally, Plaintiff cannot show implausibilities or incoherencies in the termination decision. At the time the decision to terminate Plaintiff's employment was being explored, Plaintiff had been explicitly told that she needed to be present on site because this was not a remote role.  (SOMF ¶¶ 81, 85.)  Immediately after one of those several discussions, Plaintiff was then away from work for the next two weeks following a car accident.  (Id. ¶ 87.)

Further, the performance concerns that were identified are not ones which Plaintiff can evidence are implausible or pretextual.  The fact that Plaintiff suffered from POTS does not mean that the employee's failure to meet Company standards is suddenly excused. See Reed, 244 F.3d at 262.  Plaintiff was terminated for reasons unrelated to her disability, and her bare suspicion otherwise is insufficient to meet her burden to create a triable issue of fact as it relates to Liberty Bay's legitimate non-discriminatory reason for Plaintiff's termination.

As in Serrano-Colon v. United States Department of Homeland Sec., 121 F.4th 259 (1st Cir. 2024), a Plaintiff cannot simply ignore their problematic attendance record (or performance failings) to persuade a Court of animus or implausibility. There, as here, the defendant presented evidence of the plaintiff's frequent absenteeism, repeated failure to notify her supervisors of her absences in advance, and noncompliance with the defendant's requests for adequate documentation to support her absences.  The defendant further pointed to warnings provided to plaintiff that failure to improve attendance could result in disciplinary action, including removal.

23

Id. at 279. Here, Plaintiff was likewise notified of the impact her absences and time away from work was having (SOMF ¶¶ 81, 85) and her general failure to lead the organization, but failed to amend her behaviors. The action Liberty Bay took was consistent with its previous communications and thus, Plaintiff is unable to show any implausibilities or incoherencies.

### III. Plaintiff's requests to not work or work remotely were never denied and her pending request was not reasonable. (Counts II, V)

Plaintiff alleges that Defendants failed to engage in the interactive process and failed to provide Plaintiff with a reasonable accommodation. (Am. Compl. ¶¶ 72-79, 99-106.) Such broad conclusions are unsupported by the undisputed record in the matter. "To prevail on a failure-to-accommodate theory of disability discrimination, a plaintiff must produce sufficient evidence for a reasonable juror to find that: '(1) plaintiff is disabled within the meaning of the ADA, (2) plaintiff was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) plaintiff's employer, despite knowing of plaintiff's disability, did not reasonably accommodate it." Tucker v. Town of Scarborough, No. 2:19-cv-00213-GZS, 2020 WL 3271936, at *7 (D. Me. June 17, 2020) (citation modified). As part of this analysis, Plaintiff has the burden to establish the proposed accommodation "would enable [her] to perform [her] job effectively and is, at least on the face of things, reasonable." Kvorjak, 259 F.3d at 54. If Plaintiff evidences this, the employer may rebut "with evidence that the proposed accommodation was not feasible." Tucker, 2020 WL 3271936, at *7.

At the outset, Plaintiff has failed to establish the second and third elements of the prima facie case. As to the second element, Plaintiff could not perform the essential functions of the job with or without reasonable accommodation. As discussed at length in Section I(a), supra, the role of Executive Director required consistent and onsite presence at the Liberty Bay facility in order to effectively manage the operations and staff. Working in person was an essential function of the

job; Plaintiff's failure to work on-site as a result of car issues, unrelated health matters, caretaking responsibilities and her request to move forward more consistently working remotely during flare-ups of her condition, would not have (and as of the date of termination had not) permitted Plaintiff to effectively perform the essential functions of the job.  The requested accommodation also was not feasible because of the debilitating nature of the flare-ups, rendering Plaintiff unable to perform the Executive Director job in any consistent capacity, whether she was onsite or remote.

As to the third element, Plaintiff's assertion Defendants failed to engage in the interactive process, this conclusion is not supported by the record, and cannot serve as the basis for her failure-to-accommodate claim.  As the First Circuit explained in Kvorjak v. Maine, 259 F.3d 48, 52-53 (1st Cir. 2001), while failure to engage in the interactive process *may* amount to a violation of the ADA, omission of the interactive process "is 'of no moment' if the record forecloses a finding that the plaintiff could perform the duties of the job, with or without reasonable accommodation."  In other words, because Plaintiff could not perform the essential functions of the job with or without reasonable accommodation, whether Defendants engaged in the interactive process is a moot point. Further, the MHRA does not impose any requirement on employers to engage in the interactive process.  Kezer v. Central Me. Med. Ctr., 40 A.3d 955, 963-64 (Me. 2012).

In the current situation, Defendants provided Plaintiff with the ability to work remotely or not work at all for a wide variety of reasons—child care responsibilities, COVID, car accidents, emergency room visits, disability symptoms, and doctor's appointments.  (SOMF ¶¶ 45, 48-50, 52-54, 56, 63-66, 72-75, 77-80, 87, 93, 103.)  While Defendants did not participate in the interactive process or ask for proof of the reason for the need for leave at that time, they also did not object or restrict Plaintiff's ability to not work or work from home.  Only after Plaintiff realized the seriousness of her performance deficiencies following her March 17, 2023 meeting with

Ekberg did Plaintiff begin the process of officially requesting an accommodation. (Id. ¶¶ 88, 89, 92). Following her realization of the precariousness of her position following the one-on-one with Ekberg, Plaintiff asked her PCP for documentation (Id. ¶ 83). She did this despite being aware of Defendants' reasonable accommodation request process and failing to request an accommodation at the outset of employment. (Id. ¶ 43-44).

On March 20, when Plaintiff ultimately submitted a request for a reasonable accommodation (the first business day following her one-on-one with Ekberg), the interactive process was initiated and Plaintiff was provided with paperwork to request a reasonable accommodation and leave. (SOMF ¶ 95.) Plaintiff failed to return to work after March 17. (SOMF ¶ 87.) Her absences from work after that date were related to a car accident. Id. Although Plaintiff was terminated for performance reasons while the interactive process was ongoing, and before she submitted Defendants' reasonable accommodation paperwork, Defendants did not fail to participate in the interactive process and had been providing the accommodation requested—time away from work and remote work (both for her health condition and for non-health-related reasons)—for the entirety of her employment. See Mohammadian v. Ciba Vision of Puerto Rico, Inc., 378 F. Supp. 2d 25, 30-31 (D.P.R. 2005) (no ADA failure to accommodate claim exists if accommodation requests were granted). Accordingly, for the above-stated reasons, summary judgment is appropriate on Plaintiff's failure-to-accommodate claims alleged in Counts II and V.

IV. **Plaintiff cannot establish ADA or MHRA interference or retaliation because there were legitimate business reasons supporting Plaintiff's termination such that there is no causal connection between Plaintiff's termination and any protected activity. (Counts III, VI)**

a. **Plaintiff cannot evidence that there was any interference with her ability to take advantage of rights guaranteed by the ADA and MHRA.**

26

Plaintiff alleges that she engaged in protected conduct by requesting an accommodation, and that Defendants "coerced, intimidated, threatened, and/or interfered with" her rights under the MHRA and ADA by declining to engage in the interactive process, by failing to permit her to complete her reasonable accommodation paperwork, and by terminating her employment after her request for accommodation.  (Am. Comp. ¶¶ 80-86, 107-113.)  Section 12203(b) of the ADA prohibits coercing, intimidating, threatening, or interfering with "any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed . . . any right granted or protected by" the ADA. 42 U.S.C. § 12203(b). "Generally, courts treat interference claims under § 12203(b) like retaliation claims under § 12203(a)" and the plaintiff is required "to establish that (1) she engaged in, or aided others in engaging in, conduct protected by the ADA; (2) she suffered an adverse action prohibited by § 12203(b), such as coercion, intimidation, or interference; and (3) there was a causal connection between her conduct and the adverse action." Colligan v. Mary Hitchcock Memorial Hosp., No. 16-cv-513, 2018 WL 6607706, at *8 (D.N.H. Dec. 17, 2018).

Here, Plaintiff has failed to present any evidence of coercion, intimidation, or interference. Insomuch as Plaintiff is alleging her termination amounts to interference, Plaintiff's claim fails; as discussed above, Plaintiff is unable to show a causal connection between her request for an accommodation and her termination. Supra, Section II.  While Plaintiff's Amended Complaint claims Defendants failed to engage in the interactive process, such statement as to Liberty Bay is expressly contradicted by her own statements that: (1) no requests to work remotely or to take time away were denied; and (2) she was informed about her rights to accommodations and provided paperwork to request the accommodation. (SOMF ¶¶ 76, 96.) Prior to completing the paperwork, Plaintiff had already been taking time away from work and working remotely for reasons related to her disability and numerous reasons unrelated to her disability, and thus the accommodation she

27

sought (time away from work or remote work) was being instituted—despite being unreasonable. The accusation that Defendants did not permit Plaintiff to complete her paperwork is also baseless: nearly two weeks passed between Plaintiff's receipt of the paperwork and her termination, during which time she submitted several additional medical notes to Gilpatrick providing for additional time away from work due to her car accident, (id. ¶ 99), and could have submitted her accommodation paperwork.  Defendants took no action to inhibit that process and thus Plaintiff is unable to prove elements two or three of the standard. See Colligan, 2018 WL 6607706, at *8.

### b. Plaintiff cannot evidence that she experienced retaliation in connection with her exercise of rights under the ADA and MHRA.

There is likewise no basis to Plaintiff's claim of retaliation under the MHRA or ADA.  A prima facie case of retaliation under the ADA requires Plaintiff to show that "(1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." Richard v. Reg'l Sch. Unit 57, 296 F. Supp. 3d 274, 277 (D. Me. 2017).  The McDonnell Douglas burden-shifting framework applies permitting Defendants to establish the legitimate, non-discriminatory basis for its actions, which Plaintiff must rebut. Johnson, 657 F. Supp. at 183.  Under the MHRA, Plaintiff's retaliation claim requires that she demonstrate she "engaged in protected activity and experienced an adverse employment action that was causally connected to the protected activity," but the singular inquiry is "'whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent.'" Id. (quoting Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018)).

Under both analyses, Plaintiff's claims must fail because there is no causal connection between the protected activity and any adverse action as discussed in detail in Section II, supra. Liberty Bay has presented a legitimate non-discriminatory reason for Plaintiff's termination which

28

Plaintiff cannot evidence is pretextual.  As a result, Plaintiff is unable to evidence a causal connection between her protected activity and her termination, and thus cannot meet the Richard or Johnson standard. See Richard, 296 F. Supp. 3d at 277; Johnson, 657 F. Supp. at 183.

**V.    Defendants Granite Recovery Holdings, LLC, and BayMark Health Services, Inc., did not employ Plaintiff and are improper parties.**

Plaintiff's Amended Complaint alleges "BayMark, Granite, and Liberty Bay . . . were an integrated enterprise and/or joint employer of Ms. Rodzik." (Amended Complaint, ¶ 12.)[9] Other than Plaintiff's broad allegation, however, there is no further evidence in the record to support her conclusion that BayMark and/or Granite had any employment relationship with her such that they may be liable for the claims alleged in the Amended Complaint. Under the ADA and the MHRC an "employee" is "an individual employed by an employer." 42 U.S.C. 12111(4); 5 MRS 4553(3); see Howland v. Ellevet Sciences Inc., No. 2:24-cv-00442, 2026 WL 734720, at *2 (D. Me. Mar. 16, 2026) (Title VII and MHRC). Courts in Maine and the First Circuit have used agency principles in better understanding this circular definition.  See Howland, 2026 WL 734720, at *2; Brown v. Bank of America, 5 F. Supp. 3d 121, 131 (D. Me. 2014) ("there is no significant difference between the definition of the term 'employer' in Title I of the ADA and Title VII of the Civil Rights Act of 1964 (Title VII)" (citations omitted)).

In the current matter, while there were individuals who were not employed by Liberty Bay who played a role in Plaintiff's termination, performance management, and onboarding, none of those individuals were employed by Defendants BayMark or Granite and thus both entities have been improperly named as parties.  Specifically, Ekberg was not employed by Granite Recovery Holdings, LLC, because it employed no people between 2022 and 2024. (SOMF ¶ 4.) Ekberg was

---

[9] Paragraph Six of Plaintiff's Amended Complaint defines Granite Recovery Holdings, LLC as "Granite" and Paragraph Seven of Plaintiff's Amended Complaint defines BayMark Health Services, Inc. as "BayMark".

employed by Granite Recovery Centers, LLC. (SOMF ¶ 6.) Similarly, Baymark Health Services, Inc. did not employ Richardson or Gilpatrick as it employed no people between 2022 and 2024. (SOMF ¶¶ 5, 90, 91, 92.)

While Granite is a parent company of Liberty Bay (SOMF ¶ 2), and Baymark is a parent of Granite (SOMF ¶ 3), there is no evidence on the record that either of these parent companies played a role in Plaintiff's employment such that joint employer or integrated enterprise liability attaches.  In order to evidence that Defendants are a joint employer, "it must be determined whether both control 'the labor relations of a given group of workers.'"  Burnett v. Ocean Properties, Ltd., 422 F. Supp. 3d 400, 415 (D. Me. 2019) (quoting Rivas v. Federacion de Asociaciones Pecuarias de P.R., 929 F.2d 814, 820 (1st Cir. 1991)). "'The joint employer doctrine seeks to hold an entity liable to an employee of another entity if the evidence shows that it sufficiently had power over the employee in question.'" Id. at 415 (quoting Acosta, 674 F. Supp. 2d at 371). Factors used in determining joint employer status include: "Supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime; and authority over the number of employees." Id. (quoting Rivera-Vega, 70 F.3d at 163). Plaintiff has put no evidence in the record to support the conclusion that Defendants are joint employers as none of the people who worked alongside Plaintiff were employed by Granite or Baymark as neither entity employed anyone.  (SOMF ¶¶ 4, 5, 6, 90, 91, 92.)

Further, Plaintiff cannot argue that Defendants are an integrated enterprise. In determining whether two or more entities "count as a single employer under the ADA in the 'widely recognized' integrated-enterprise test" the court considers the following four factors: "(i)

30

'centralized control over labor relations'; (ii) 'interrelation between operations'; (iii) 'common management'; and (iv) 'common ownership.'" Burnett v. Ocean Properties, Ltd., 987 F.3d 57, 65 (1st Cir. 2021). As the First Circuit in Burnett noted, "the test should be applied flexibly, placing special emphasis on the control of employment decisions." Id. Here, however, as neither Granite nor Baymark employed any individuals, they could not have controlled labor relations, had interrelation between operations, or had common management. (See SOMF ¶¶ 4, 5, 6, 90, 91, 92.) While other sister entity employees may have worked alongside Plaintiff or overseen her work or communicated the termination decision, none of those employees were employed by Defendants Granite or Baymark. (See Id. ¶¶ 2, 3, 4, 5, 6, 90, 91, 92.)

This is not a situation in which Defendants played "hide the ball" as to its corporate make-up. Instead, in its responses to Plaintiff's Interrogatory requests, it specifically explained the corporate make-up of the organization. In direct response to Plaintiff's Interrogatory #12, Defendant BayMark noted the exact relationship between each of the entities: "Granite Recovery Holdings, LLC, is a subsidiary of BayMark Residential Treatment Services, Inc., which is a subsidiary of BayMark Health Services, Inc. Granite Recovery Holdings, LLC, is a parent to Granite Recovery Center, LLC, which operates Liberty Bay Recovery Center, LLC." (Id. ¶ 2.) Insomuch as Plaintiff is now asking the Court to disregard the entity structure, however, there is no evidence to justify piercing the corporate veil to make unaffiliated entities liable for the purported behavior undertaken by Liberty Bay. Accordingly, Defendants respectfully submit that Granite and Baymark are improper parties to the current litigation and should be dismissed.

**VI.    Plaintiff's claims under the ADA are untimely because the Complaint was filed before receipt of the right-to-sue letter from the EEOC.**

Plaintiff commenced this action on March 18, 2025. Plaintiff's counsel reached out to the EEOC on Wednesday, May 28, 2025, seeking right-to-sue letters against BayMark Health

Services, Liberty Bay Recovery Center, LLC and Granite Recovery Holdings, LLC, related to the claims Plaintiff had filed against the Defendants. (SOMF ¶ 111). Plaintiff's counsel first received the Notice of Rights for the relevant charges on May 29, 2025. (Id. ¶ 112). Plaintiff filed an Amended Complaint in this action on May 30, 2025. (ECF Dkt. 9).

Plaintiff's ADA claim is governed by the procedural requirements of Title VII of the Civil Rights Act of 1964. See Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 142 (1st Cir. 2012) (citing 42 U.S.C. secs. 2000e-5 to 9; 42 U.S.C. sec. 12117(a)). It is well-established that receipt of the right-to-sue letter is a prerequisite to filing suit on federal discrimination claims including the ADA. See, e.g., Richards v. City of Bangor, Me., 878 F. Supp. 2d 271, 278-79 (D. Me. 2012) ("**receipt** of the EEOC's notice is a precondition"); Stimson v. Goodwill Indus. of N. New England, No. 99-335, 1999 WL 3311712 (D. Me. Dec. 20, 1999) (dismissing complaint for failure to plead **receipt** of right-to-sue letter); 42 U.S.C. § 12117 (noting that **receipt** of the right to sue letter "is ordinarily a prerequisite to suit . . . ."). Because there is no genuine dispute of fact that Plaintiff had not received a right-to-sue letter from the EEOC before filing suit—having filed suit on March 18 and receiving the letter on May 29—summary judgment is appropriate with respect to Plaintiff's ADA claims. See also Fed. R. Civ. P. 15(c) (providing that amended complaints related back to the date of the original pleading). Defendants respectfully submit that Counts I, II, and III be dismissed as Plaintiff failed to receive the right to sue notice from the EEOC prior to filing suit. See Ricards, 878 F. Supp. 2d at 278-79.

## CONCLUSION

For the foregoing reasons, summary judgment in favor of Defendants is proper.

Dated at Portland, Maine, June 10, 2026

/s/ Elizabeth T. Johnston_____
Elizabeth T. Johnston, Esq., Bar No. 5806

32

Tawny L. Alvarez, Esq., Bar No. 5173
Verrill Dana, LLP
One Portland Square
Portland, ME 04101
Phone:  207-774-4000
Fax:  207-774-7499
ejohnston@verrill-law.com
talvarez@verrill-law.com
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 10, 2026, I electronically filed Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Elizabeth T. Johnston</u>
Elizabeth T. Johnston, Esq., Bar No. 5806
VERRILL DANA LLP
One Portland Square
Portland, ME  04101
Telephone (207) 774-4000
ejohnston@verrill-law.com

34

29948381_1